IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ASTELLAS PHARMA INC., ASTELLAS IRELAND CO., LTD., and ASTELLAS PHARMA GLOBAL DEVELOPMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MSN PHARMACEUTICALS INC. and MSN LABORATORIES PRIVATE LIMITED <br><br> Defendants. | **CIVIL ACTION NO. 23-689-JFB-CJB** <br><br> **MEMORANDUM AND ORDER** |

Before the Court is Plaintiffs' Motion to Enforce a Settlement Agreement. D.I. 17.[1] Astellas[2] claims it agreed to settle a patent infringement action with MSN.[3] The problem for Astellas is the purported settlement agreement contains a clause providing "[t]his Agreement shall not be binding on the Parties until it has been signed below by all the Parties." D.I. 23 at 195. MSN did not sign. Because the language of the final draft agreement evidences a "positive agreement that it should not be binding until so reduced to writing and formally executed," Astellas has not met its burden of showing there is any settlement agreement to enforce. *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1287 (Del. Ch. 2004) (quoting *Universal Prods. Co. v. Emerson*, 179 A. 387 (Del. 1935)). Therefore, Astellas's motion is denied.

---

[1] The filing was made in Case No. 1:23-cv-00689 before it was consolidated with the current above captioned lead case. Unless otherwise indicated, all citations to the record are in Case No. 1:23-cv-00689.
[2] Plaintiffs, Astellas Pharma Inc., Astellas Ireland Co., LTD., and Astellas Pharma Global Development, Inc.
[3] Defendants, MSN Pharmaceuticals, Inc. and MSN Laboratories Private Limited.

1

## BACKGROUND

This is a patent infringement action concerning a treatment for overactive bladder manufactured by Astellas under the brand name Myrbetriq®. MSN wants to manufacture a generic version of the drug and filed an Abbreviated New Drug Application (ANDA) with the FDA. *See* 21 U.S.C. § 355(j).[4] MSN's ANDA filing allowed Astellas to sue for patent infringement under 35 U.S.C. § 271(e)(2).[5] Astellas did exactly that and filed this lawsuit on June 23, 2023. D.I. 1.

The parties began negotiating a possible settlement before the complaint was filed. D.I. 18-1 (May 30, 2023, email reading: "[w]e represent MSN for this product, and I wanted to see if we could begin settlement discussions."). On July 5, 2023, Astellas kickstarted formal negotiations by sending a model settlement agreement they had used in negotiations with other generics manufacturers. D.I. 23 at 28. Generally, the proposed settlement provided for the dismissal of the current action and allowed MSN to sell their generic formulation under a license agreement. Relevant to the current dispute, Astellas's first proposed settlement agreement contained the following term (the Signature Provision):

> 11. **Term.** This Agreement shall not be binding on the Parties until it has been signed below by all the Parties, at which time it shall be deemed effective as of its Effective Date. The releases and discharges set forth in Paragraph 2 of this Agreement shall survive the termination of this Agreement, and the confidentiality obligations set forth in Paragraph 18 of this Agreement shall survive for a period of five (5) years from the Effective Date. Any provision specified to survive termination in the Agreement shall so survive as specified. The term of this Agreement shall extend until, and end upon, the later of the Patent Expiry Date or expiry of any exclusivity associated with any Future Orange Book Listed Patent.

---

[4] 21 U.S.C. § 355(j) allows the FDA to approve a generic version of a drug based on the safety and efficacy studies conducted on the brand-name drug.
[5] 35 U.S.C. § 271(e)(2) permits an innovative manufacturer to seek an injunction to prevent a generic drug manufacturer from entering the market, if the generic product would infringe a patent held by the innovative manufacturer.

D.I. 23 at 195. Over the next four months, the parties negotiated the terms of the settlement through email and redlined copies of Astellas's initial proposed settlement agreement. *See generally* D.I. 18-1 (the parties' email correspondence). Two key issues dominated negotiations: (1) how the outcomes in pending litigation over the patents in suit would impact MSN's obligations under the license agreement, and (2) certain details of the license agreement.[6] *See e.g.* D.I. 23 at 177. The parties exchanged multiple redlined copies of the settlement agreement but did not make any changes to the Signature Provision. *Compare* D.I. 23 at 16 (October 5, 2023) *with id.* at 41 (July 5, 2023) *and id.* at 68 (July 19, 2023) *and id.* at 87 (August 9, 2023) *and id.* at 135 (September 29, 2023) *and id.* at 195 (October 12, 2023). Nor did the parties discuss changes to the Signature Provision in the emails discussing the draft agreements. *See generally* D.I. 18-1.

In fall of 2023, it appeared the parties were nearing settlement. Specifically, on September 14th, 2023, MSN sent Astellas a revised draft implementing certain changes to "evaluate whether it gets us across the finish line." D.I. 18-1 at 10. After Astellas offered edits of its own, on October 5, 2023, counsel for MSN indicated they were "very close" to an agreement, offered a redlined copy containing "two revisions for [Astellas's] consideration," and closed the email writing "[p]lease let me know if you have any questions or comments, otherwise we can proceed towards signing." *Id.* at 23. The October 5 draft contained the Signature Provision. D.I. 23 at 16. In response, on October 11, 2023, counsel for Astellas's emailed "Astellas is ok with the changes. I'll circulate a

---

[6] Outside the Signature Provision and Paragraph 16 (a standard integration clause), the specifics of the proposed settlement terms and the parties' negotiating positions have little bearing on the resolution of this motion and, in the interest of maximizing public access to the work of the courts, the Court will avoid discussion of any confidential details of the proposed settlement and associated negotiations.

copy for execution." D.I. 18-1 at 23. The execution copy, circulated on October 12, 2023, also contained the Signature Provision and was materially identical to the October 5 draft. D.I. 23 at 195.

MSN did not sign. Instead, counsel for MSN informed Astellas "MSN decided not to proceed with this proposed settlement agreement" and filed an answer. D.I. 18-1 at 21. Astellas, believing the matter settled, moved to enforce the purported settlement agreement. In parallel, the parties litigated the patent infringement case. *See* Case No. 23-486-JFB-CJB, D.I. 134 (a letter from the parties describing the status of the ongoing litigation). Relevant to this motion, Magistrate Judge Burke previously denied Astellas's Motion to Amend their complaint to add a breach of the settlement agreement because Astellas's allegations failed to establish a contract under Delaware law. Case No. 23-486-JFB-CJB, D.I. 111.

## LEGAL STANDARD

The Court has jurisdiction to enforce a settlement agreement in a pending case. *Maya Swimwear Corp. v. Maya Swimwear, LLC*, 855 F. Supp. 2d 229, 233 (D. Del. 2012). The standard for summarily enforcing a settlement agreement is "is similar to" the standard "on a motion for summary judgment." *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991).[7] Astellas is, thus, entitled to enforcement if there are no disputed material facts, and the material facts show they are "entitled to judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56. If there are disputed issues of material fact regarding the existence

---

[7] The law of the regional circuit controls on a motion to enforce a settlement agreement in a patent case because the "issue is not unique to patent law." *MedPointe Healthcare, Inc. v. Kozachuk*, 373 F. App'x 62, 64 (Fed. Cir. 2010).

4

or validity of the settlement agreement, the Court should not enforce the agreement on a summary basis. *Id.* at 1038.

The enforcement of a settlement agreement is an issue of state contract law. *Parker-Hannifin Corp. v. Schlegel Elec. Materials, Inc.*, 589 F. Supp. 2d 457, 461 (D. Del. 2008). Absent a choice of law provision in the contract, the Court applies the law of the jurisdiction with the "most significant relationship to the dispute." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941); *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 896 (Del. 2021). Here, the purported contract does not contain a choice of law clause, and the parties agree Delaware law applies. D.I. 21 at 11 (citing Delaware law). So, the Court applies Delaware law as articulated by the Delaware Supreme Court. *Franchetti v. Intercole Automation, Inc.*, 523 F. Supp. 454, 455 (D. Del. 1981). If the Delaware Supreme Court has not addressed an issue, the Court will predict how they would resolve the case based on "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data." *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 46 (3d Cir. 2009) (internal quotations omitted).

## DISCUSSION

MSN raises several arguments[8] against enforcing the settlement agreement, including an argument that the Signature Provision created a condition precedent, precluding formation of an enforceable settlement agreement. *See* D.I. 21 at 6.

---

[8] Specifically, MSN argues: (1) there was no objective manifestation of assent, (2) contract formation is foreclosed by the Signature Requirement, (3) there was no consideration, and (4) counsel lacked actual or apparent authority to settle. The Signature Provision issue is dispositive, so the Court does not address MSN's other contentions.

5

## A. Legal Framework

"A deal is not final until the ink is dry" is usually a maxim of business -- not contract law. However, when contracting parties choose to make the contract binding upon the execution of a signed written agreement, Delaware law respects that choice.

Specifically, a contract is formed when the parties' objective conduct demonstrates "an offer, acceptance, and consideration." *Trexler v. Billingsley*, 166 A.3d 101 (Del. 2017) (table). In determining whether a contract was formed "the parties' 'overt manifestation of assent—not subjective intent—controls.'" *Loppert*, 865 A.2d at 1285 (quoting *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971). Usually,

> Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed.

*Id.* at 1287 (quoting *Universal Prods. Co. v. Emerson*, 179 A. 387 (Del. 1935)).

But, parties can agree to a condition precedent, or "an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises." *Lockwood v. Capano*, 105 A.3d 989 (Del. 2014) (table) (quoting 13 Williston on Contracts § 38:7 (4th ed.)). If the parties "agree[] that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed." *Id.* So, a signed and executed agreement is not a prerequisite for contract formation unless the parties "parties positively agree that there will be no binding contract until the formal document is executed." *Loppert*, 865 A.2d at 1287 (quoting *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998).

6

These contract law principles apply to settlement agreements. *Loppert*, 865 A.2d at 1285 ("[A] settlement agreement is enforceable as a contract."). A settlement agreement is formed when "a reasonable negotiator . . . would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential." *Id.* (*quoting Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)). Thus, a settlement agreement is enforceable without a signed writing, unless the parties agree otherwise through the language of their agreement or conduct in negotiations. *See Brady v. Huber*, No. 2019-0204-SEM, 2023 WL 3736371, at *6–*7 (Del. Ch. May 31, 2023) (collecting cases).

**B. There is no enforceable settlement agreement because the parties' contract made a formal executed document a condition precedent to contract formation.**

Here, while the parties reached agreement on the material terms of a settlement, the Signature Provision is a "positive agreement" that a signed copy of the agreement is a condition precedent to settlement. *Loppert*, 865 A.2d at 1287. Because MSN did not sign, Astellas has not met their burden of showing an enforceable settlement agreement.

The conduct of the parties demonstrates they reached a meeting of the minds on the terms contained in the October 5 draft agreement.[9] A party objectively manifests acceptance when they unconditionally respond to an offer to contract "on identical terms as the offer." *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004). Here, MSN's October 5 email and draft agreement objectively evidence an intent to be bound by the settlement agreement. Specifically, the draft reflects final edits to the key terms that had been the focus of the parties' negotiations. D.I. 23 at 11–14. The October

---

[9] Dismissing a pending case in exchange for a patent license agreement is certainly consideration capable of supporting a contract. *DiSabatino v. U.S. Fid. & Guar. Co.*, 635 F. Supp. 350 (D. Del. 1986).

7

5 email states that the parties were "very close" to a final agreement and, if Astellas was happy with the changes, they would "proceed towards signing." D.I. 18-1 at 23. In response, Astellas did not make any changes to the draft, unequivocally stated "we ok with the changes," and took steps to proceed towards execution. *Id.* at 23. Therefore, the parties conduct reflects a meeting of the minds on settling the litigation on the terms outlined in MSN's final draft agreement.

Under different circumstances, this could have ended the matter. However, the draft settlement agreement contained the Signature Provision. As a reminder, a formally executed copy is not required unless "parties positively agree that there will be no binding contract until the formal document is executed." *Loppert*, 865 A.2d at 1285. For example, in *Riblett*, the parties to a trust and estates dispute attended a mediation in which they reached agreement on the key issues in the litigation but one of the parties refused to sign the settlement agreement. *Riblett v. Riblett*, No. CV 12786-MZ, 2018 WL 1352329, at *2 (Del. Ch. Mar. 15, 2018). The court refused to enforce the purported settlement agreement because the parties' mediation agreement specifically provided "[i]f a settlement is reached, the agreement shall be reduced to writing and when signed, shall be binding upon all parties to the agreement and become part of the court record" which a reasonable negotiator would understand to mean the settlement agreement was not effective until signed. Id. at *3. Here, like *Riblett* the purported agreement contains the Signature Provision, which specifically provides the "[a]greement shall not be binding on the Parties until it has been signed below by all the Parties." The term is unambiguous: signatures are required to create a binding agreement. Astellas proposed the term, did not object to the term at any stage of negotiations, and the term appears, unchanged, in

8

the October 5 version of the contract. A reasonable negotiator in MSN's position would, thus, understand that signatures were a necessary condition to settling the matter. The Signature Provision, therefore, operated as a condition precedent for settlement, meaning "no binding contract will arise until the" agreement was signed. *Lockwood,* 105 A.3d 989. Because MSN did not sign, no binding contract arose.

Because the parties "positively agreed" to require signatures, the Court will not "treat the insistence upon a writing as unimportant" and must conclude "no enforceable contract had yet been formed despite agreement upon all of the substantive terms of a contract." *Transamerican S.S. Corp. v. Murphy*, No. CIV.A. 10511, 1989 WL 12181, at *2 (Del. Ch. Feb. 14, 1989). Therefore, Astellas cannot meet its burden of showing there is no dispute of material fact, or that they are entitled judgement as a matter of law.

### C. Astellas's arguments to the contrary lack merit.

Seeking to avoid the consequences of the Signature Provision, Astellas raises four arguments. None establish that Astellas is entitled to summary enforcement of the purported settlement agreement.

**1. The Court cannot ignore the Signature Provision because it was not specifically discussed in negotiations.**

First, Astellas argues that the parties did not reach an agreement on the Signature Provision and the Court should only enforce the terms that the parties specifically negotiated but this argument misses the key moment in settlement negotiations. Specifically, Astellas claims that it presented its original offer on a "take it or leave it" basis and MSN rejected it, thus rejecting all the provisions and allowing the parties to negotiate an agreement from the ground up on only the key terms. Astellas is correct that responding to an offer with different terms operates as a rejection of that offer. *PAMI-*

*LEMB I Inc.*, 857 A.2d at 1015. But that initial rejection is little help to Astellas because the Signature Provision appeared in every subsequent version of settlement agreement proposed by the parties including MSN's October 5 final proposed agreement and Astellas's October 12 execution copy. D.I. 23 at 16; *id.* at 195. In other words, the continued presence of the Signature Provision in the draft agreements, including the final versions from each party, would tell a reasonable negotiator that the Signature Provision was a term of the parties' agreement.[10] Indeed, because nobody objected to the term, a reasonable negotiator would understand that it was an uncontroversial aspect of the bargain. Astellas provides no basis for enforcing only the "core" of the agreement, while ignoring other terms agreed to by the parties.

### 2. The Court cannot ignore the Signature Provision because it was not an essential term.

Second, Astellas argues that because the Signature Provision was "boilerplate" and not "an essential term" it is unenforceable, but Astellas confuses two related concepts under Delaware law. Specifically, even when there is a meeting of the minds on some terms, no contract is formed if there are still essential terms left open. *Maya Swimwear Corp.*, 855 F. Supp. 2d at 234. However, if parties agree on the essential terms, their failure to discuss or agreed on nonessential "additional, boilerplate terms" preclude formation of an enforceable agreement. *Id.* at 236 (quoting *Loppert*, 865 A.2d at 1289). This issue is entirely separate from whether the parties "positively agreed" to condition their settlement on a formal executed agreement.

---

[10] Astellas did not produce any extrinsic evidence demonstrating either party disclaimed the Signature Provision during negotiations. Even if they had, such evidence would, at best, demonstrate a disputed factual issue regarding the terms of the agreement, precluding summary enforcement. *Tiernan*, 923 F.2d at 1038.

*Maya Swimwear* demonstrates that these two issues are separate. There, the parties to a copyright suit reached an agreement in principle to settle but the defendant reneged before the parties executed a formal settlement agreement. *Id.* at 233. The defendant raised two defenses to enforcement: (1) the parties contemplated a written agreement, and (2) the parties had not agreed on all essential terms. *Id.* at 235. The court rejected both arguments, concluding: (1) there was no intrinsic or extrinsic evidence suggesting settlement was conditioned on a signed agreement, and (2) the parties agreed on all essential terms and the remaining terms were "boilerplate and conventional." *Id.* at 235–37. Nowhere did the court hold that an agreement to require signatures would be unenforceable as standard or boilerplate because no such term existed in the parties' agreement.

Indeed, the *Transamerican S.S. Corp.* court rejected such an argument writing, "[t]hat it does not involve a substantive term does not provide the court with a ground to brush aside the point which appears to have been clearly preserved." 1989 WL 12181 at *2. So, whether the Signature Provision is an "essential term" is irrelevant to whether it is an enforceable term of the parties' agreement or establishes a condition precedent to contract formation.

**3. The Signature Provision does not render Paragraph 16 superfluous.**

Third, Astellas argues enforcing the Signature Provision would render other terms in the contract superfluous but Astellas's reading of the contract is strained and creates its own superfluousness problems. Specifically, Astellas points to Paragraph 16 of the agreement which provides:

> This Agreement (including all attachments hereto) constitutes the entire agreement and understanding between the Parties with respect to the

11

> subject matter hereof and supersedes all prior agreements or understandings, oral or written, with respect to such matters, including agreement or understanding reached or communicated between the Parties, directly, through counsel, or otherwise, in connection with the Lawsuit. Finally, Astellas cites to cases where this Court has enforced settlement agreements absent a signed agreement, but each is distinguishable.

D.I. 23 at 17. Astellas argues that because the language of Paragraph 16 contemplates other agreements, the Signature Provision would render this provision superfluous. Not so. True, contracts are read to avoid rending provisions as superfluous. *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("Contracts will be interpreted to give each provision and term effect and not render any terms meaningless or illusory."). But, even with the Signature Provision, Paragraph 16 has plenty of work to perform. Specifically, Paragraph 16 is a straightforward integration clause that would prevent either party from introducing prior agreements that contradicted or supplemented the terms of the final agreement and limiting the admissibility of extrinsic evidence to interpret the final agreement. *See generally* 2 Voss on Delaware Contract Law § 8.138 (describing the many uses of an integration clause). So, the presence of the Signature Provision does not render the Paragraph 16 "meaningless or illusory." *Manti Holdings, LLC*, 261 A.3d at 1208.

Indeed, Astellas's interpretation creates its own problems, rendering the Signature Provision "meaningless or illusory." Specifically, if the Signature Provision was silently invalidated by Paragraph 16, its requirement that the agreement be signed to become effective and effective date tied to the execution of the agreement would do no work. Put another way, if Paragraph 16 allows for the agreement to become effective without signatures, what is the point of including a provision requiring signatures? Rather than

adopt Astellas's "interpretation that leads to unreasonable results," the Court "will adopt the construction that is reasonable and that harmonizes the affected contract provisions." *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. 2010). The Signature Provision requires an executed agreement to create an enforceable agreement, thus preventing accidental contract formation during settlement negotiation and creating a brightline moment of effectiveness. Once effective, Paragraph 16 prevents Astellas and MSN from relying on statements made in negotiations to contradict the terms embodied in the fully executed agreement. The provisions, therefore, can function in harmony and the Court need not use Paragraph 16 to invalidate the Signature Provision.

### 4. A contractual term can evidence a "positive agreement" to condition formation on an executed agreement.

Fourth, Astellas argues a "positive agreement" to require signatures must occur "during negotiations" but cites no authority supporting that contention. D.I. 38 at 9. True, the cases cited by Astellas involved representations made during negotiations. *See Schwartz v. Chase*, No. CIV.A. 4274-VCP, 2010 WL 2601608, at *8 (Del. Ch. June 29, 2010) (finding a party could unilaterally condition settlement on signatures based on statements in negotiations); *Transamerican S.S. Corp.*, 1989 WL 12181, at *2 (same). But none of the cases cited by Astellas articulate a rule that a "positive agreement" must be shown by statements in negotiations and cannot be shown by a contract term and the Court has located none. D.I. 38 at 9. Nor does such a rule make sense. Indeed, under Delaware law, "[i]f a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent," meaning it would be anomalous to adopt a rule that requires ignoring the plain language of an agreement in favor of silence in contract negotiations to understand the

13

intent of the parties. *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

Astellas asserts this court articulated such a proposition in *Honeywell*, a case in which the "[c]ourt upheld an unsigned 'final version' of a settlement agreement despite the agreement requiring 'signatures of their duly authorized representatives.'" D.I. 38 at 11 (quoting *Rohm & Haas Elec. Materials, LLC v. Honeywell Int'l, Inc.*, No. C.A. 06-297-GMS, 2009 WL 1033651, at *6 (D. Del. Apr. 16, 2009)). *Honeywell* does not bear the weight Astellas puts on it. Tellingly, the clause cited by Astellas was cited in a footnote discussion of a separate issue and played no part in the court's analysis of whether the parties reached a "positive agreement" to require signatures. *Compare Honeywell*, 2009 WL 1033651 at *6 (concluding the parties did not positively agree to require signatures) *with id.* at 6 (citing the clause when discussion whether Honeywell's attorneys had authority to settle the matter). The full text of the clause shows why. Specifically, the cited portion of the contract read, "the Parties hereto have caused this Agreement to be duly effective and delivered as of the date and year first above written by the signatures of their duly authorized representatives." *Id.* at *6 n.12. This is the quintessential example of contract language contemplating, but not requiring a signed written document. *Universal Prods. Co. v. Emerson*, 179 A. 387, 394 (Del. 1935). Here, by contrast, the Signature Provision uses mandatory language to require signatures. D.I. 23 at 16 ("This agreement *shall not* be binding on the Parties until it has been signed below by all the Parties.") (emphasis added). So, neither the analysis performed by the court in *Honeywell* nor the contract language at issue in that case establish that a contract term is insufficient evidence of a "positive agreement" to require signatures.

14

In sum, none of Astellas's counter arguments allow the Court to set aside the explicit language of the purported agreement.

**CONCLUSION**

It is unfortunate the settlement negotiations fell apart in this manner because "Delaware law favors voluntary settlement of contested suits" and settlement provides certainty for both the generic and the innovative manufacturer. *Schwartz*, 2010 WL 2601608, at *4. Nevertheless, "[u]nder Delaware law, sophisticated parties are bound by the terms of their agreement" and "the role of the court is to enforce the agreement as written" "[e]ven if the bargain they strike ends up a bad deal for one or more parties." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021). If there is any silver lining, perhaps the resolution of this motion will give the parties a moment to revisit settlement negotiations considering subsequent developments in the Myrbetriq® litigation. *See e.g.*, *Astellas Pharma, Inc. v. Sandoz Inc.*, 117 F.4th 1371, 1381 (Fed. Cir. 2024) (reversing the Court's invalidation of one of the patents in suit); Case No. 23-486-JFB-CJB, D.I. 134 (summarizing existing disputes between the parties).

While Astellas may now regret adding the Signature Provision to the proposed agreement, they are bound by that choice.

THEREFORE, IT IS ORDERED:

1. Astellas's Motion to Enforce a Settlement Agreement, D.I. 17, is denied.

Dated this 21st day of January, 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge